## OCHOA v. FORT WORTH & D. C. RY. CO.
### (No. 2816.)

Court of Civil Appeals of Texas. Amarillo.
April 13, 1927.

**1. Master and servant ⊚⊃286(14)—Evidence of railway's negligence, causing death of workman from explosion of nitroglycerin on right of way burned, held insufficient for jury.**

Evidence that railway was not responsible for the presence of a can of nitroglycerin on its right of way, or that it did not sufficiently protect employee burning grass under supervision of foreman from explosion causing his death, *held* insufficient to require submission of issue of negligence to jury.

**2. Master and servant ⊚⊃206—Section hand burning grass assumed risk of explosion of nitroglycerin can, not shown to have been placed by railway.**

Section hand engaged in interstate commerce, burning grass along the right of way under the supervision of a foreman, *held* to have assumed the risk of the explosion of a can of nitroglycerin on the right of way, but which was not shown to have been placed there by the railway.

Appeal from District Court, Wichita County; E. G. Thornton, Judge.

Suit by Maria J. Ochoa against the Fort Worth & Denver City Railway Company. Judgment for defendant, and plaintiff appeals. Affirmed.

Weeks, Morrow, Francis & Hankerson, of Wichita Falls, for appellant.

Carrigan, Britain, Morgan & King, of Wichita Falls, for appellee.

HALL, C. J. This suit was instituted by the appellant, as the surviving wife of Pablo Ochoa, against appellee, railway company, to recover for the death of her husband, who is alleged to have ben killed through the negligence of the defendant, railway company, and its employees, about the 17th day of February, 1926, while working as a section hand on the railroad's right of way in Wichita county.

She alleged that her deceased husband had been employed by the defendant as a member of a section crew of which J. J. Martin was section foreman. That Martin, as section foreman, was vice principal; that at the time of the accident in question, her husband was 30 years of age, was able-bodied, in good health, was earning and would have continued to earn the sum of $85 per month for the remainder of his life. At the time of his death, her husband was working under the direction of Martin, the section foreman, burning the grass off of the right of way, and was doing his work in a careful and prudent manner. That Martin found a large can on the rail-

road right of way, which appeared to be new and had not been opened. That the section foreman did not examine it to ascertain the nature of its contents, but handled the same in such manner that it exploded, resulting in the death of her husband. She alleges that it was the duty of the defendant and its section foreman to remove the can a safe distance from the members of the crew, and to examine it and ascertain the character of its contents before putting any fire near it; that he neglected to make such examination, and by reason of his negligence, the contents of the can exploded from effects of the fire, killing plaintiff's husband as well as other members of the crew.

The defendant company answered by general demurrer and general denial, and further alleged that the act of negligence, if any, and even if true, was not the proximate cause of the death of Pablo Ochoa; that at the time of the accident the deceased was engaged in interstate commerce, and if there was any negligence, which is denied, that deceased assumed the risk of all the conditions alleged. Contributory negligence on the part of the deceased is further set up as a bar to plaintiff's recovery.

The case was tried to a jury, and, when the introduction of testimony closed, the court directed a verdict in favor of the appellee railway company.

The case is submitted here upon one proposition to the effect that under the evidence the court erred in instructing the jury peremptorily.

It appears from the record that Martin, the foreman, had a crew composed of his son, L. J. Martin, and three Mexicans, one of which was the husband of plaintiff. The foreman and the three Mexicans were instantly killed by the explosion and L. J. Martin, who was knocked down and rendered unconscious for a short time, is the only witness who testified concerning the circumstances immediately surrounding the accident. The substance of his testimony is:

"The only way I knew there was an explosion was that it just blowed up and I was in it. I do not know what it was that blowed up. It looked like a five-gallon lube can, it looked like a square can to me—five-gallon lube can. I did not see the top of it, nor it did not stick up at either end, but it was square, each side of it. The Mexicans were to the west of me, where it already had been burned. I do not know what they were doing, watching the fire I guess. I do not recall seeing them at that time. My father was there about three feet from me, and I told them to come up and not let the fire go on the outside of the fence. He did not tell them to stay away. They were across outside of the fence where they had been fighting fire. I do not know if they came up, I called them and turned my head. I did not watch them. Neither of them touched the can, and I did not say anything to them about it."

---

⊚⊃For other cases see same topic and KEY-NUMBER in all Key-Numbered Digests and Indexes

The inference may be drawn from the testimony that what the witness calls a lube can was a five-gallon can of nitroglycerin, which had been concealed in the high grass growing in the barrow pit on the right of way.

Just when the witness first saw the can is not clear, from his testimony, but he says:

"When I saw the can I walked up to the east of my father, my father was on my left; then I walked to the left behind him and saw that the fire was about to die out. I walked up there to get a little further away from the flames. I had not seen the can at that time. As I stopped and turned, I saw it."

At another place his testimony would indicate that he had a good view of the can for a minute or so, just prior to the explosion, but he further testifies as follows:

"I could see the ground where it burned off on the north side of the trestle, but I could not see the ground on the south side of it. I could see the barrow pit; that was only three or four inches deep, and the can sat up higher than the barrow pit. Only one half of it was in the unburned portion of the grass. The other half—the fire was burning around it when I saw it. I do not remember if the can looked like it had been opened. I did not notice. I did not see any opening in the can, nor any spout to it, or handle. When I saw my father within about five feet of this can, and the fire burning around it, I did not know what it was and I did not ask my father what it was. No one said anything to the Mexicans about the can in the hearing and presence of my father at that time. The grass was dead in February, but there were a few bunches standing up so that the can was concealed, so that I could not see it until the fire was burning over it. About half of it was exposed, I suppose. The grass was heavy and thick just at that place in strips. It must have been a foot high off the ground where it concealed one end of this can. It did not cover the top of the can, but fell down to the east, burned down. About a minute or two minutes after I called the Mexican, the explosion occurred. This can was lying down; lying down it was twelve inches high, and standing up it was two feet high. I could see half of it. We were not using any kind of explosives at that time, and there was nothing at all for the Mexicans to do with reference to the use of the can. I cannot tell the jury how the can got there, or how long it had been there. The fire was burning toward us. The grass was rank and dry where the explosion took place. I walked up practically along side of my father, sorter behind him, I was just watching the fire, was not doing anything, just standing there, and I walked to his left and a little to his rear. When I was standing there behind him, I saw the can or a part of it, and about two minutes after that I saw the explosion. The fire was burning west toward me, kinda slow, but I did not see any mark "explosive," or "danger," or anything like that, on the can. My father was a few feet closer than I was. He did not run away at any time, but was killed right there at that point. He did not kick the can, or strike it with a stick of any kind or roughly handle it in any way. My father did not warn me about a dangerous condition there, and I have worked for something like four and a half years. We never used nitroglycerin in any of that work or dynamite, or any explosive of any kind, to my knowledge, since I have been employed there."

This witness further testified that he was about ten feet from the can when he first saw it. That the section hands had their shovels which they used in throwing dirt on the fire and had wet sacks for the purpose of keeping the fire from burning outside of the right of way.

It seems that the foreman's duty was to set the grass on fire, while his son and the Mexicans confined the fire to the right of way by the use of wet sacks and shoveling dirt on the burning grass.

It was admitted in open court that the section crew was engaged in interstate commerce.

[1, 2] A careful review of the statement of facts convinces us that there was no issue to be submitted to the jury. This accident occurred within a mile or two of Electra, and there is no evidence whatever to indicate that the defendant's company is in any way responsible for the presence of the can of nitroglycerin on its right of way. It evidently had been concealed in grass by third parties. While the plaintiff alleges that the can was labeled with the words "explosive" and "danger," there is no testimony to this effect. The Mexicans were closer to the can than the foreman at the time of the explosion, and the inevitable conclusion is that the explosion was the result of the fire rather than from the act of some one in striking it. No negligence is shown by reason of the act of the company in having the grass burned along the right of way; in fact, the legal duty rested upon the company to keep its right of way free from combustible material. There is nothing in the record to suggest any negligence on the part of the railway company or its section foreman. The death of Ochoa seems to be one of those unfortunate accidents for which no one connected with this case was in any way responsible. He assumed the risk, and, if there was negligence, it is chargeable to him equally with the others present. Fort Worth & Denver City Ry. Co. v. Goodfellow (Tex. Civ. App.) 280 S. W. 619; Gulf Refining Co. v. Simms (Tex. Civ. App.) 168 S. W. 379; T. & P. Ry. Co. v. French, 86 Tex. 96, 23 S. W. 642; G. C. & S. F. Ry. Co. v. Drennan (Tex. Civ. App.) 204 S. W. 691; Fort Worth & Denver City Ry. Co., v. Miller (Tex. Civ. App.) 201 S. W. 1049; Jones v. Galveston, etc., Ry. Co., 11 Tex. Civ. App. 39, 31 S. W. 709; Labatts Master & Servant (2d Ed.) vol. 43, § 1042; Elliott on Railroads, vol. 4, §§ 1963, 1967; Seaboard Air Line Railway Co. v. Horton, 233 U. S. 492, 34 S. Ct. 635, 58 L. Ed. 1062, L. R. A. 1915C, 1, Ann. Cas. 1915B, 475.

The judgment is affirmed.